# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: December 20, 2021

| | | |
|---|---|---|
| * * * * * * * * * * * * * | * | |
| ANGELA WRIGHT *on behalf of the* | * | |
| *Estate of KATILYN WRIGHT*, | * | No. 15-851V |
| | * | Special Master Sanders |
| Petitioner, | * | |
| | * | |
| v. | * | Attorneys' Fees & Costs; Reasonable |
| | * | Basis; Premature Ovarian Insufficiency |
| SECRETARY OF HEALTH | * | ("POI"); Autoimmune Encephalitis; Human |
| AND HUMAN SERVICES, | * | Papillomavirus ("HPV") Vaccine |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * | | |

*Robert J. Krakow*, Law Office of Robert J. Krakow, P.C., New York, NY, for Petitioner.
*Darryl R. Wishard*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

On August 10, 2015, Katilyn Wright ("Ms. Wright") filed a petition for compensation pursuant to the National Vaccine Injury Compensation Program.[2] 42 U.S.C. §300aa-10 et seq. (2012). Ms. Wright alleged that she suffered from premature ovarian failure/insufficiency ("POI")[3] and autoimmune encephalitis[4] as a result of a human papillomavirus ("HPV") vaccination

---

[1] This Decision will be posted on the United States Court of Federal Claims' website. **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access. Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Premature ovarian insufficiency ("POI") is often called primary ovarian failure ("POF"). POF is defined as the "premature cessation of ovulation [and] the absence or irregularity of menses lasting at least four months, with menopausal levels of serum gonadotropins, in an adolescent girl or woman under 40 years of age. It may be temporary or permanent." *Dorland's Illustrated Medical Dictionary* 1, 1135 (32nd ed. 2012) [hereinafter "*Dorland's*"].

[4] Autoimmune encephalitis is "inflammation of the brain[,]" which is "characterized by a specific humoral or cell-mediated immune response against constituents of the body's own tissues." *Dorland's* at 181, 612.

administered on July 28, 2011.⁵ Pet. at 1, ECF No. 1. On January 12, 2016, Ms. Wright passed away at age 18, and Angela Wright ("Petitioner"), as executrix of the Estate of Katilyn Wright, substituted as Petitioner and continued the claim. ECF Nos. 26, 27.

Petitioner filed an amended petition on May 10, 2016, alleging autoimmune encephalitis as the only injury that was caused-in-fact by Ms. Wright's 2011 HPV vaccination. Am. Pet. at 1, ECF No. 28. Petitioner moved to substitute counsel on May 24, 2017, following the death of her original attorney, Mr. Mark Krueger. ECF No. 64. Petitioner's new counsel, Mr. Robert Krakow, submitted an application for interim fees and costs on June 8, 2017, on behalf of Mr. Krueger's law practice. Pet'r's Mot. Interim Fees, ECF No. 68. Petitioner submitted a supplemental brief in support of her request on June 20, 2017. Pet'r's Br., ECF No. 69. Respondent contested Petitioner's application and argued that her claim lacked reasonable basis.⁶ Resp't's Resp. at 4, ECF No. 74. Respondent asserted that Petitioner's POI claim was time-barred, and that Ms. Wright was never officially diagnosed with POI or autoimmune encephalitis. *Id.* at 8–11. Petitioner filed a reply to Respondent's response on August 7, 2017, and argued this case maintained a reasonable basis through the filing of her interim fees application. Pet'r's Reply at 3, ECF No. 76. Petitioner's interim fees application was stayed pending a determination of reasonable basis, and I ordered her to submit an expert report in support of her claim. ECF No. 77. Instead, Petitioner moved for a decision dismissing her petition on December 27, 2017, and I dismissed the petition for insufficient proof on December 28, 2017. ECF Nos. 83–84. Petitioner's interim fees application was never reinstated.

On July 8, 2021, Petitioner filed a final motion for attorneys' fees and costs.⁷ Pet'r's Mot. Final Fees, ECF No. 97. The motion does not seek any reimbursement for Petitioner's current counsel, Mr. Robert Krakow, but seeks reimbursement for work performed by Petitioner's former counsel, Mr. Mark Krueger, prior to his death in the amount of **$49,239.70,** representing **$45,001.40** in attorneys' fees, **$3,838.30** in attorneys' costs, and **$400.00** in costs personally incurred by Petitioner. *Id.* at 7. Petitioner's motion for final fees is a renewal of her original interim fees application on behalf of Mr. Krueger. *Id.* at 1. Respondent filed his response on August 17, 2021, noting the untimeliness of the motion and stating that he "defers to the Special Master as to whether [P]etitioner's duplicative motion is appropriate or timely." Resp't's Resp. at 2, ECF No. 98. Respondent has previously articulated his objections concerning an award of fees based on a

---

⁵ Ms. Wright received her first HPV vaccination on July 27, 2010, and her second one, one year later, on July 28, 2011. Pet'r's Ex. 2 at 2, ECF No. 8-2. Petitioner's claim is based on an alleged injury resulting from the second vaccination.

⁶ Respondent did not dispute Petitioner's good faith basis for bringing the claim. Resp't's Resp. at 5.

⁷ Petitioner's motion for final attorneys' fees and costs is indeed untimely. Vaccine Rule 13(a); *But see Verity v. Sec'y of Health & Hum. Servs.*, No. 11–106V, 2017 WL 1709709, at *1 (Fed. Cl. Spec. Mstr. Mar. 13, 2017) (finding that concurrent with their broad discretion to determine the reasonableness of a request for attorneys' fees, special masters retain the discretion to consider untimely motions for attorneys' fees and costs). However, following a request from the Krueger firm to file for fees out of time, I allowed Mr. Krakow to file for fees on behalf of the Krueger firm, only. I based my decision on the unique procedural history in this case, including the passing of both Ms. Wright and her former counsel, Mr. Mark Krueger, the reasonable basis determination that remained outstanding despite the cases' dismissal, and the added constraints placed on the Court as a result of the COVID-19 pandemic.

lack of reasonable basis in his original response to Petitioner's application for interim fees and costs. *See* Resp't's Resp. at 4, ECF No. 74. Petitioner did not file a reply thereafter.

## I. Medical History

Ms. Wright's medical history pre vaccination is unremarkable. On July 27, 2010, she received her first HPV vaccination, and on July 28, 2011, she received her second HPV vaccination. Pet'r's Ex. 2 at 2, ECF No. 8-2.

On May 31, 2012, approximately ten months post vaccination, Ms. Wright sought treatment at the Northside Fayette Hospital for a sudden onset headache. Pet'r's Ex. 15f at 602, ECF No. 15-6. Ms. Wright reported that 30 minutes prior to arrival, she had experienced an episode of hyperventilating, dizziness, and her vision had started to go black. *Id.* She then developed a headache in her forehead and at the base of her neck. *Id.* at 599. She underwent a lumbar puncture, and the results were normal. *Id.* at 609–10. A head CT noted a one-centimeter area of hypodensity within the left frontal lobe. *Id.* at 611. The interpreting radiologist recommended a follow-up MRI. *Id.*

On June 1, 2012, Ms. Wright sought treatment at Children's Healthcare of Atlanta. Pet'r's Ex. 5d at 329, ECF No. 8-6. She reported that her headache began one day prior and was accompanied by brief vision loss and blurriness. *Id.* At the time of this appointment, she reported that her vision had returned to normal, but she still suffered from a headache. *Id.* at 330. Ms. Wright also complained of abdominal pain. *Id.* at 341. The medical notes from this visit reveal that Epstein Barr virus ("EBV")[8] titers were "suggestive of [a] recent infection." *Id.* at 337, 340. Ms. Wright was admitted for further evaluation and underwent another lumbar puncture. *Id.* at 341. The opening pressure was normal, which ruled out increased cerebral spinal fluid pressure as a cause of the headache. *Id.* An MRI of the brain yielded normal results. *Id.* at 325. At discharge on June 6, 2012, Ms. Wright had continued complaints of a headache. *Id.* The notes indicated that some of her pain could be related to tension in her neck and upper shoulder muscles, and her gastric pain could be due to gastritis from her pain medications. *Id.* at 325–26. She was told to follow up with ophthalmology, neurology, and physical therapy. *Id.* at 329. Ms. Wright continued to seek treatment at Northside Hospital three times over the following two weeks for blurry vision, headaches, and abdominal pain. Pet'r's Ex. 15e at 582, 585, 588, ECF No. 15-5.

On June 19, 2012, Ms. Wright sought treatment with Dr. Gerald Silverboard, a neurologist. Pet'r's Ex. 7 at 1, ECF No. 9-2. Dr. Silverboard noted that Ms. Wright complained of persistent headaches that varied in intensity between 8 to 10 out of 10. *Id.* Petitioner reported that Ms. Wright was having panic attacks, was hallucinating (reportedly seeing angels and a man), was more forgetful, and her personality seemed "different." *Id.* Dr. Silverboard assessed Ms. Wright with a "transform migraine," hallucinations, and anxiety. *Id.* at 3. He recommended exercise, psychiatric care, and a headache diary. *Id.*

---

[8] Epstein-Barr virus is also referred to as "human herpesvirus 4." *Dorland's* at 638. Human herpesvirus 4 is "a virus . . . that caused infectious mononucleosis and is associated with Burkitt lymphoma and nasopharyngeal carcinoma." *Id.* at 2061.

On July 3, 2012, Ms. Wright returned to Dr. Silverboard complaining of headaches. *Id.* at 5. She reported that she was able to interact with friends, but she experienced "word clutter and some slurred speech." *Id.* Dr. Silverboard did not observe these abnormalities during Ms. Wright's visit and encouraged her to seek psychiatric care. *Id.*

On August 21, 2012, Ms. Wright received trigger point injections and an occipital nerve block to treat her headache pain. Pet'r's Ex. 5b at 150, ECF No. 8-4. She continued to complain of severe headache and abdominal pain and was admitted to Children's Healthcare of Atlanta. *Id.* Petitioner underwent another lumbar puncture, and the opening pressure was normal. *Id.* The records note that her persisting abdominal pain could be due to her pain medications or "a post viral [inflammatory bowel syndrome]," following her EBV infection. *Id.* Petitioner continued to suffer from abdominal pain and persistent vomiting. *Id.* Her treaters noted that migraines could be the cause and opined that the abdominal symptoms would resolve with effective migraine treatment. *Id.* On August 27, 2012, Ms. Wright was placed on a feeding tube (due to the vomiting) and discharged three days later, on August 30, 2012. *Id.*

On November 6, 2012, Ms. Wright returned to Children's Healthcare of Atlanta with continued complaints of headache, abdominal pain, and vomiting. Pet'r's Ex. 5c at 244, ECF No. 8-5. She reported that she had been unable to attend school due to headaches and concentration problems. *Id.* at 273. Ms. Wright stated that had been receiving hyperbaric oxygen treatment[9] for the last four – to – five weeks, and from "mid-September over the next 6 weeks, she remained well and was headache, vomiting, and abdominal pain free." *Id.* at 259. She reported that her symptoms, however, had recently returned and were severe. *Id.* Ms. Wright underwent an upper gastrointestinal series and an EEG, with normal results. *Id.* at 213, 231. Her headaches continued despite medications, and a peripherally inserted central catheter ("PICC") line was inserted to counter her vomiting. *Id.* at 232. Ms. Wright improved after a few days and was discharged on November 20, 2012, with a referral to a gastroenterologist. *Id.* at 263.

On December 10, 2012, Ms. Wright returned to her gastroenterologist with reports of "no improvement," and complaints of continued vomiting with the inability to eat. Pet'r's Ex. 6 at 7, ECF No. 9-1. He recommended treatment at a pain clinic and referred her to an infectious disease specialist. *Id.* at 9. On that same day, Ms. Wright saw Dr. Madhavi Rayapudi, an infectious disease specialist. Pet'r's Ex. 11 at 1, ECF No. 9-6. The medical record from this visit indicates that Ms. Wright was wheelchair bound, reported a "facial droop," and that she had suffered from "large joints" for a few weeks. *Id.* at 3. Upon examination, Ms. Wright could ambulate without difficulty and had symmetrical muscle strength. *Id.* at 4. Dr. Rayapudi's assessment of Petitioner indicated "acute illness most likely tick-borne illness." *Id.* at 5. Ms. Wright's testing for Ehrlichia,[10] Rocky

---

[9] Hyperbaric oxygen treatment is "exposure of a patient to oxygen under pressure greater than normal atmospheric pressure, done for individuals who need more oxygen than they can take in by breathing in the normal atmosphere or with an oxygen mask." *Dorland's* at 1356.

[10] Ehrlichia is "a genus of tick-borne bacteria." *Dorland's* at 596.

Mountain Spotted Fever ("RMSF"),[11] and Lyme disease[12] were all negative. *Id.* at 70–72. An ANA screen was also negative. *Id.* at 73.

Ms. Wright returned to Dr. Rayapudi on December 14, 2012, and reported no improvement. *Id.* at 7. Dr. Rayapudi assessed her with "possible Lyme disease with positive serology and an [sic] MRI findings[,]" and he continued her on Rocephin, an antibiotic. *Id.* at 11. For the next four months, Dr. Rayapudi maintained his diagnosis of Lyme disease and continued her treatment regiment, despite no significant improvement. *Id.* at 11–54.

On January 15, 2013, Ms. Wright underwent another MRI, which revealed a "well demarcated ovoid area of bright signal in the subcortical white matter of the left frontal lobe, medially." Pet'r's Ex. 5d at 380. The lesion did not enhance and looked smaller than it did on her May 31, 2012 MRI; no other lesions were noted. *Id.* By March 28, 2013, Ms. Wright reported no significant improvement on Rocephin, and she was unable to walk or eat. Pet'r's Ex. 11 at 52.

On May 13, 2013, Ms.Wright began treatment with Ellie Campbell, D.O., a holistic and functional healthcare provider. Pet'r's Ex. 13a at 78, ECF No. 10-1. During that visit, she was unable to lift herself up due to weakness and reported that she was unable to swallow food. *Id.* Petitioner reported that Ms. Wright was evaluated by a psychiatrist in August 2012, who concluded that she was "emotionally unstable and that her conditions were the result of her cries for attention." *Id.* at 80. Dr. Campbell noted that Ms. Wright had suffered a "lifelong history of neurologic and immunologic insults," starting with her traumatic birth, antibiotic exposure, steroid exposure (to treat her asthma), a traumatic brain injury as a toddler, and repeated head injuries during basketball. *Id.* at 82. Dr. Campbell explained that Ms. Wright's "altered immune system has resulted in multiple infections that are unusual: mononucleosis with minimal symptoms, Lyme's disease, and Bell's palsy.[13]" *Id.* She noted that Ms. Wright was suffering from "profound neuro-inflammation," and she recommended treatment to "detoxify the Gardisil [sic] and her other previous vaccinations." *Id.* Ms. Wright continued treatment with Dr. Campbell but did not report an improvement in her symptoms. *Id.* at 78–100; Pet'r's Ex. 13b at 100–115, ECF No. 10-2.

On May 29, 2013, Ms. Wright underwent an EEG for reports of significant and frequent seizures, with negative findings. Pet'r's Ex. 15d at 375, ECF No. 15-4. By June 25, 2013, Ms.

---

[11] Rocky Mountain Spotted Fever is "an acute, infectious, sometimes fatal disease caused by *Rickettsia rickettsii*, usually transmitted by the bite of an infected tick . . .; it occurs only in North and South America. It is characterized by sudden onset; chills; fever lasting 2 to 3 weeks; a cutaneous rash that appears early and spreads from the limbs upwards onto the trunk and face; myalgias; severe headache; and prostration." *Dorland's* at 1651.

[12] Lyme disease is "a recurrent, multisystemic disorder caused by the spirochete *Borrelia burgdorferi*; vectors for human infection are the ticks *Ixodes scapularis* and *I. pacificus.* It begins in most cases with erythema chronicum migrans (at least 5 cm in diameter), often accompanied by fatigue, malaise, chills, fever, headache, and regional lymphadenopathy, followed after several weeks or months by highly variable manifestations that may include musculoskeletal pain, involvement of the heart and the nervous system, and conjunctivitis and other eye abnormalities. Persistent infection, which may last for months or years, is characterized by arthritis of large joints and, in some cases, neurologic manifestations, including chronic axonal polyneuropathy, ataxia, and spastic paraparesis." *Dorland's* at 538.

[13] Bell's palsy is "unilateral facial paralysis of sudden onset, due to lesion of the facial nerve and resulting in characteristic distortion of the face." *Dorland's* at 208.

Wright reported that she was so weak she was unable to bathe without assistance. Pet'r's Ex. 13a at 61. During an examination on September 18, 2013, Dr. Campbell noted that Ms. Wright "also has many features of brain injury, possibly from her Gardasil vaccine disturbing the blood brain barrier and allowing Lyme penetration, or possible [sic] from the vaccine itself." *Id.* at 57. She also noted "[p]roblems with menstrual cycles includ[ing] dysmenorrhea.[14]" *Id.* at 56.

On January 24, 2014, Ms. Wright was seen at Northside Hospital for right arm pain. Pet'r's Ex. 15b at 207, ECF No. 15-2. A culture taken from her PICC line site revealed a streptococcus infection.[15] *Id.* at 217.

On March 10, 2014, Dr. Campbell's assessment of Ms. Wright included grand mal seizure[16] disorder, unspecified causes of encephalitis,[17] myelitis,[18] and encephalomyelitis.[19] Pet'r's Ex. 13a at 33. Dr. Campbell saw Ms. Wright on July 10, 2014, and noted she was having problems with her menstrual cycle to include dysmenorrhea, and she was assessed with polycystic ovarian disease.[20] *Id.* at 28, 29. During a visit with an infectious disease specialist on October 13, 2014, for a PICC line infection, Petitioner noted that Ms. Wright was going to Pennsylvania State Medical Center for an evaluation of her encephalitis. Pet'r's Ex. 8 at 7, ECF No. 9-3.

Ms. Wright's records end in October 2015, and she passed away a short time later, on January 12, 2016. Pet'r's Ex. 16 at 1, ECF No. 22-1. Dr. Campbell indicated on the death certificate that the cause of death was "undetermined natural causes," autoimmune encephalitis, Lyme disease, "seizure disorder, bedridden with intravenous nutrition," and that a "significant condition contributing to death," was the "Gardasil vaccine." *Id.*

---

[14] Dysmenorrhea is "painful menstruation." *Dorland's* at 578.

[15] A streptococcus infection is an infection occurring due to the streptococcus bacteria. It is "a genus of . . . the family *Streptococcaceae*, consisting of nonmotile, non–spore-forming cocci occurring in pairs or chains; organisms are chemo-organotrophic, facultatively anaerobic, and cytochrome-, oxidase-, and catalase-negative. Many species are human or animal commensals or parasites, and some are pathogenic." *Dorland's* at 1782.

[16] Grand mal seizures are associated with grand mal epilepsy. Grand mal epilepsy is "a symptomatic form of epilepsy often preceded by an aura; characterized by loss of consciousness with generalized tonic-clonic seizures." *Dorland's* at 633.

[17] Encephalitis is "inflammation of the brain." *Dorland's* at 612.

[18] Myelitis is "1. inflammation of the spinal cord, often part of a more specifically defined disease process. One group of diseases is named according to whether primarily white matter or gray matter is affected . . .; another group is defined by whether there is coexistent disease of the meninges *(meningomyelitis)* or the brain *(encephalomyelitis)*. In practice, the term is also used to denote noninflammatory lesions of the spinal cord; 2. inflammation of the bone marrow[.]" *Dorland's* at 1218.

[19] Encephalomyelitis is "inflammation involving both the brain and the spinal cord." *Dorland's* at 613.

[20] Polycystic ovary disease is also called polycystic ovarian syndrome. It is defined as "a clinical symptom complex associated with polycystic ovaries, characterized by [] amenorrhea, anovulation (hence infertility), and hirsutism . . . ." *Dorland's* at 1844. Polycystic ovaries are "ovaries containing multiple, small follicular cysts filled with yellow or blood-stained, thin serous fluid[.]" *Id.* at 1352. Anovulation is "the absence of ovulation." *Id.* at 96. Hirsutism is "abnormal hairiness, especially an adult male pattern of hair distribution in women." *Id.* at 861.

## II.  Reasonable Basis Determination

### a. Standards of Review

An analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *6–7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 283 (2014). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1346 (Fed. Cir. 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert and clarifying that "the failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion."). Indeed, determining what constitutes "more than a mere scintilla" is a "daunting task." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 15-1291V, 2021 WL 3085502, at *13 (Fed. Cl. Spec. Mstr. July 21, 2021).

While the Court in *Cottingham* did not purport to identify all forms of objective evidence reflective of reasonable basis, it stated that "objective medical evidence, including medical records . . . even where the records provide only circumstantial evidence of causation" can support a showing of reasonable basis. *Cottingham,* 971 F.3d at 1346 (citing *Harding v. Sec'y of Health & Hum. Servs.,* 146 Fed. Cl. 381, 403 (2019)). The *Cottingham* Court also reiterated that the reasonable basis determination is still based on a "totality of the circumstances." *Cottingham,* 971 F.3d at 1346.

In another recent opinion regarding reasonable basis, the Federal Circuit stated that medical records, affidavits, and sworn testimony all constitute objective evidence to support reasonable basis. *James-Cornelius v. Sec'y of Health & Hum. Servs.,* 984 F.3d 1374, 1379–81 (Fed. Cir. 2021). The Federal Circuit further clarified that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis." *Id.* at 1379 (citing *Cottingham*, 971 F.3d at 1346). When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Hum. Servs.,* 138 Fed. Cl. 282, 289 (2018). This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.,* No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

Additionally, there may be reasonable basis at the time that a claim is filed, which then dissipates as the claim proceeds. *R.K. v. Sec'y of Health & Hum. Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Hum. Servs.,* 33 F.3d 1375, 1376–77 (Fed. Cir. 1994) holding that "an award of fees and costs was not authorized for work performed on a case after a claim lost its reasonable basis."). If reasonable basis is lost, "Petitioners' counsels have an obligation to voluntarily dismiss a Vaccine Act claim once counsel knows or should know a claim cannot be proven." *Cottingham v. Sec'y of Health & Hum. Servs.,* 134 Fed. Cl. 567, 574

7

(2017) (citing *Perreira*, 33 F.3d at 1376; *Curran v. Sec'y of Health & Hum. Servs.,* 130 Fed. Cl. 1, 6 (2017); *Allicock v. Sec'y of Health & Hum. Servs.,* 128 Fed. Cl. 724, 727 (2016)).

### b. Reasonable Basis Analysis

Respondent challenges the reasonable basis of Petitioner's claim from the time it was filed through her application for interim fees. He argues that Ms. Wright was never diagnosed with POI or autoimmune encephalitis, the two alleged vaccine-caused injuries. Resp't's Resp. at 8–9. Indeed, Petitioner does not identify anywhere in the record where Ms. Wright was diagnosed with POI by a medical provider. Ms. Wright contended that she suffered from POI in the petition based on her symptoms of reproductive dysfunction. Pet. at 2. While the Federal Circuit has held that the receipt of a vaccine and severity of symptoms are facts that may be best received from the patient, they also clarified that "lay opinions as to causation or medical diagnosis may be properly categorized as mere subjective belief when the witness is not competent to testify on those subjects." *James-Cornelius,* 984 F.3d at 1380. The record does not contain evidence that shows Ms. Wright was competent to make her own diagnosis. In her reply to Respondent's response to Petitioner's motion for fees, Petitioner asserts that "[t]he medical records, alone, meet the reasonable basis standard and support the contention that [Ms. Wright] had a reasonable basis to file her claim." Pet'r's Reply at 3. Petitioner notes that Ms. Wright's medical record from a September 18, 2013 office visit with her primary care provider notes "[p]roblems with menstrual cycles include dysmenorrhea." Pet'r's Ex. 13a at 56. Ms. Wright's record also includes a notation from a July 10, 2014 physical examination, that assessed her with polycystic ovarian disease. *Id.* at 29. While this does provide evidence that Petitioner experienced some symptoms consistent with POI, her medical record does not provide a definitive diagnosis of the same condition. Indeed, guidance provided by the Federal Circuit identifies types of objective evidence to be considered for a reasonable basis determination, to include circumstantial evidence from the medical record. In this case, however, due to statute of limitations grounds discussed below, it is not necessary for me to determine whether Ms. Wright did in fact suffer from POI, or even if the medical record contains objective evidence that Ms. Wright may have suffered from some ovarian injury.

Ms. Wright also contended in the petition that her "symptom or manifestation of onset of her [POI] was November 25, 2012, when she had her last menses." Pet. at 3. However, Ms. Wright described irregularities in her cycle that began in September of 2011 and persisted until November 2012, when it eventually ceased. *Id.*; *see also* Pet'r's Reply at 3. Indeed, the manner in which Ms. Wright initially described her symptoms suggests that she believed there was a continuation from September 2011 to November 2012. Ms. Wright's petition states that her "menses continued every 35–45 days until November 2012. She has not had a menses since approximately November 25, 2012." Pet. at 2. Furthermore, Petitioner never provided any argument or medical evidence to support her contention that Ms. Wright's irregular menstrual cycle was unrelated to the eventual cessation of said cycle. The timing and continuity of Ms. Wright's symptoms, from less frequent menstruation to amenorrhea,[21] support Respondent's contention that this was a logical progression that began in 2011. As previously noted, the petition in this case was filed on August 10, 2015, almost four years later. *See* Pet. at 1. By statute, "no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of

---

[21] Amenorrhea is defined as the "cessation of menstruation after it has once been established at puberty." *Dorland's* at 59.

the first symptom or manifestation of onset or of the significant aggravation of such injury[.]" 42 U.S.C.A. § 300aa-16(a)(2). As Ms. Wright's first manifestation of any symptoms that are consistent with POI occurred in September of 2011, at the time of filing, approximately four years later, Petitioner's claim of vaccine-caused POI was time-barred. Therefore, I find no reasonable basis for Petitioner's claim with respect to that injury.[22]

Respondent further argues that Petitioner did not present preponderant evidence that Ms. Wright suffered from autoimmune encephalitis. Resp't's Resp. at 8–9. He contends that "[t]he only provider who diagnosed [Ms. Wright] with autoimmune encephalitis is Dr. Campbell[, Ms. Wright's primary care physician], but she does not have the requisite credentials to diagnose a neuroimmunological condition." *Id.* at 9. Respondent notes that "Dr. Campbell's own website indicates she is a family physician; she has no specialized training in neurology, immunology, or infectious diseases." *Id.* While Dr. Campbell may not have a background in neurology or immunology, she was Ms. Wright's primary care provider. Her assessment of encephalitis during a July 10, 2014 visit, is certainly the type of objective evidence on diagnosis that Respondent would have had the opportunity to rebut with his own expert. *See* Pet'r's Ex. 13a at 29. Dr. Campbell also posited a potential causal theory for Ms. Wright's encephalitis, noting "she [] has many features of brain injury, possibly from her Gardasil vaccine disturbing the blood brain barrier and allowing Lyme penetration, or possibl[y] from the vaccine itself." *Id.* at 57. Furthermore, Ms. Wright's death certificate lists autoimmune encephalitis as a cause of death and the Gardasil vaccine as a "significant condition contributing to death but not related to cause." Pet'r's Ex. 16. Respondent makes arguments regarding a lack of diagnosis that were likely factors in Petitioner's ultimate decision to dismiss. *See* Resp't's Resp. However, a successful outcome with respect to entitlement is not the standard for reasonable basis. *See Chuisano,* 116 Fed. Cl. at 283. The opinion of Ms. Wright's medical provider on causation and her death certificate provide "more than a mere scintilla of evidence sufficient to establish reasonable basis" for Petitioner's claim. *James-Cornelius,* 984 F.3d at 1380; *Cottingham*, 971 F.3d at 1346. While Petitioner's claim did not have reasonable basis with respect to her claim of vaccine-caused POI, I find there was reasonable basis with respect to her encephalitis claim. I therefore find that Petitioner is entitled to reasonable attorneys' fees and costs.

### III. Reasonable Attorneys' Fees and Costs

#### a. Applicable Law

The Vaccine Act permits an award of reasonable attorneys' fees and costs. § 15(e). The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and

---

[22] The Supreme Court has held that an untimely petition filed in the Program may still recover attorneys' fees and costs if filed in good faith and with a reasonable basis. *Sebelius v. Cloer,* 569 U.S. 369, 382 (2013) (noting that special masters "have shown themselves more than capable of discerning untimely claims supported by good faith and a reasonable basis from those that are specious."). However, with respect to Petitioner's POI claim, I find that it lacked a reasonable basis based on very apparent statute of limitations grounds. Indeed, I do not find it necessary to further determine the reasonable basis of Petitioner's POI claim and diagnosis based on the medical records, because its severe untimeliness is determinative. Additionally, my finding of reasonable basis relative to Petitioner's encephalitis claim renders it moot.

9

costs under the Vaccine Act. *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1348 (Fed. Cir. 2008). This is a two-step process. *Avera,* 515 F.3d at 1348. First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347–48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Second, a court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. *Avera,* 515 F.3d at 1348.

It is "well within the special master's discretion" to determine the reasonableness of fees. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521–22 (Fed. Cir. 1993); *see also Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991) ("[T]he reviewing court must grant the special master wide latitude in determining the reasonableness of both attorneys' fees and costs."). Applications for attorneys' fees must include contemporaneous and specific billing records that indicate the work performed and the number of hours spent on said work. *See Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 316–18 (2008). Such applications, however, should not include hours that are "'excessive, redundant, or otherwise unnecessary.'" *Saxton*, 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

Vaccine Rule 13(a) provides that "[a]ny request for attorney's fees and costs pursuant to 42 U.S.C. § 300aa–15(e) must be filed no later than 180 days after the entry of judgment . . . ." Vaccine Rule 13(a). Concurrent with their broad discretion to determine the reasonableness of a request for attorneys' fees, special masters retain the discretion to consider untimely motions for attorneys' fees and costs. *See Verity v. Sec'y of Health & Hum. Servs.*, No. 11–106V, 2017 WL 1709709, at *1 (Fed. Cl. Spec. Mstr. Mar. 13, 2017). "[I]t is not uncommon in the [P]rogram for special masters to overlook the untimeliness of fee[ ] requests filed not long after the deadline to act." *Id.* (citing *Turner*, 2007 WL 4410030, at *13 (awarding fees to a request one month untimely); *Carrington v. Sec'y of Health & Hum. Servs.*, No 99–495V, 2008 WL 2683632, at *13 (Fed. Cl. Spec. Mstr. June 18, 2008) (granting a three-week extension of time to submit a motion for fees)); *see also, e.g.*, *Setness v. Sec'y of Health & Hum. Servs.*, No. 13–996V, 2017 WL 1713101, at *1 n.3 (Fed. Cl. Spec. Mstr. Mar. 10, 2017) (granting a motion for fees filed two months after the deadline). This leniency, however, is under the special master's discretion, and is not always exercised in a tardy counsel's favor. *See, e.g.*, *Verity*, 2017 WL 1709709 at *2 (denying a fee request more than two years untimely).

   **b.**  **Hourly Rate**

The decision in *McCulloch* provides a framework for consideration of appropriate ranges for attorneys' fees based upon the experience of the practicing attorney. *McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *mot. for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). The Court has since updated the *McCulloch* rates, and the Attorneys' Forum Hourly Rate Fee Schedules for 2015–2016, 2017, 2018, 2019, 2020, and 2021 can be accessed online.[23]

Petitioners requests the following hourly rates for the work of her counsel: for Mr. Mark Krueger, $350.00 per hour for work performed in 2015, $363.00 per hour for work performed in

---

[23] The Fee Schedules are available at http://www.uscfc.uscourts.gov/node/2914.

2016, and $376.00 per hour for work performed in 2017; and for Mr. Andrew Krueger, $200.00 per hour for work performed in 2015–2017. Pet'r's Mot. Final Fees at 6. These rates are consistent with what counsels have previously been awarded for their Vaccine Program work, and I find them to be reasonable herein.

### c.  Reasonable Number of Hours

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera,* 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton,* 3 F.3d at 1521 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983)).

Upon review, I find the overall hours billed to necessitate a small reduction. The billing entries are sufficiently detailed to allow me to assess the reasonableness of the work performed. However, there are two minor issues. First, paralegals have billed time on clerical tasks, such as scanning and filing documents and paying invoices. Second, the hours billed on communications such as e-mails and telephone calls appear to be slightly inflated. The billing records reflect that a minimum of twelve minutes was billed for all tasks. In my experience reviewing billing records, not all communication in a case would take a minimum of twelve minutes to complete. For example, it should not take an experienced paralegal twelve minutes to e-mail a Medicaid printout to Respondent's counsel, or to reach out to Respondent's counsel regarding an extension of time.

In sum, I find a five percent reduction to the attorneys' fees requested is reasonable to offset the noted issues. This results in a reduction of **$2,250.07.** Petitioner is therefore awarded final attorneys' fees in the amount of **$42,751.33.**

### d.  Attorney Costs

Like attorneys' fees, a request for reimbursement of attorneys' costs must be reasonable. *Perreira v. Sec'y of Health & Hum. Servs.,* 27 Fed. Cl. 29, 34 (1992). Petitioner requests a total of $3,838.30 in attorneys' costs, comprised of acquiring medical records and postage. Petitioner has provided adequate documentation of all these expenses, and they are reasonable in my experience. Petitioner has also personally incurred costs of $400.00 for the Court's filing fee, which is also reasonable. Accordingly, Petitioner is awarded the full amount of costs requested in the amount of **$4,238.30.**

### III.  Conclusion

In accordance with the Vaccine Act, 42 U.S.C. §15(e) (2012), I have reviewed the billing records and costs in this case and finds that Petitioner's request for fees and costs, other than the reductions delineated above, is reasonable. Based on the above analysis, I find that it is reasonable to compensate Petitioner and her former counsel's firm as follows:

| | |
|---|---|
| Attorneys' Fees Requested | $45,001.40 |
| (Reduction to Fees) | - ($2,250.07) |
| **Total Attorneys' Fees Awarded** | **$42,751.33** |
| | |

| | |
|---|---|
| Attorneys' Costs Requested | $3,838.30 |
| (Reduction of Costs) | - |
| **Total Attorneys' Costs Awarded** | **$3,838.30** |
| | |
| **Total Attorneys' Fees and Costs** | **$46,589.63** |
| | |
| **Petitioner's Costs** | **$400.00** |
| | |
| **Total Fees and Costs Awarded** | **$46,989.63** |

**Accordingly, the following is hereby awarded:**

1) **a lump sum in the amount of $46,589.63, representing reimbursement for Petitioner's attorneys' fees and costs, in the form of a check payable to Petitioner and Krueger Hernandez & Thompson, SC; and**

2) **a lump sum in the amount of $400.00, representing reimbursement for Petitioner's costs, in the form of a check payable to Petitioner.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment herewith.[24]

**IT IS SO ORDERED**.

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master

---

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.